UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JULIO ISLEY SMITH,

                                         Plaintiff,

       vs.                                                              9:06-CV-505
                                                                   (GTS/ATB)

GARY GREENE, Superintendent,

                                         Defendant.
_____

JULIO ISLEY SMITH, Plaintiff pro se
JAMES SEAMAN, Ass't Attorney General, for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

    This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by United States District Judge Glenn T. Suddaby.[1]  In the only remaining claim in plaintiff's amended civil rights complaint, he alleges that he was transferred from one prison to another in retaliation for writing a letter of complaint, to the New York State Inspector General's Office, about the assault of another inmate.  (Dkt. No. 10).  Plaintiff seeks substantial monetary relief.

    Presently before this court is a renewed motion for summary judgment, pursuant to FED. R. CIV. P. 56, by the sole remaining named defendant, Gary Greene, Superintendent of Great Meadow Correctional Facility ("Great Meadow").  (Dkt. No.

_____

[1] The case was originally assigned to Senior District Judge Lawrence Kahn and Magistrate Judge Gustave J. DiBianco, but has since been transferred to District Judge Suddaby and me.

89).  Plaintiff responded in opposition to the motion (Dkt. No. 98), and defendant filed a reply (Dkt. No. 99).  Plaintiff was thereafter permitted to file a sur-reply (Dkt. No. 102), which he belatedly resubmitted in "corrected" form (Dkt. No. 103).

For the following reasons, this court recommends that the defendant's motion for summary judgment be granted, and the amended complaint dismissed in its entirety, with prejudice.  No reasonable jury could find that defendant Greene was personally involved in the alleged retaliatory transfer.  It is extremely doubtful that plaintiff could state a viable claim of retaliation against any employee of  New York State Department of Correctional Services ("DOCS") in connection with his transfer. In any event, any DOCS employee who was involved would be entitled to qualified immunity because it was not clear, under controlling authority at the time of the alleged conduct in 2006, that an inmate's complaint about the alleged assault of another inmate was protected speech that could support a retaliation claim.

## DISCUSSION

I.  **Procedural History**

Throughout his responses to the current summary judgment motion, the plaintiff claims that he requires additional discovery to be able to amend his complaint and properly oppose the pending motion.  (Dkt. No. 98 at 1, 4; Dkt. No. 98-1 at 3; Dkt. No. 98-2 at 11; Dkt. No. 98-3 at 3; Dkt. No. 103 at 3-4).[2]  In order to place these arguments in proper context, the court must summarize the torturous procedural

---

[2] Given the proliferation of plaintiff's opposition papers, the court will refer to them by the docket number and page number assigned by the clerk's CM-ECF system.

history of this case.  Plaintiff's original complaint, filed on April 25, 2006, was insufficient under FED. R. CIV. P. 8(a), and District Judge Lawrence E. Kahn issued a conditional order of dismissal, affording plaintiff an opportunity to correct the deficiencies and file an amended complaint.  (Dkt. No. 7).  Plaintiff filed his amended complaint, naming Gary Greene, Superintendent of Great Meadow Correctional Facility; C.F. Kelly, Jr., Captain; James Levine, Prison Guard; Michael Molisani, Prison Guard; Colleen Russell, Prison Guard; and two "John Doe," Prison Guard defendants.  (Dkt. No. 10).

In an order, dated December 21, 2006, District Judge Kahn allowed the amended complaint to proceed, but ordered the dismissal of defendants Molisani and Russell because the only allegations against these two defendants were related to the alleged assault of another inmate.  (Dkt. No. 12 at 2, 3).  Judge Kahn also advised plaintiff that he could not proceed against unknown defendants, and that if he wished to continue the action against the "John Doe" officers, plaintiff would have to seek to identify them, move to amend the complaint accordingly, and have them served with process.  *Id.* at 2.  Plaintiff was also advised that if the individuals were not timely served, the action would be dismissed against them.  *Id.*

On March 28, 2007, defendants moved to dismiss the amended complaint for failure to state a cause of action, pursuant to FED. R. CIV. P. 12(b)(6).  (Dkt. No. 22). Although plaintiff's response to defendants' motion to dismiss (Dkt. No. 30 at 8) appeared to contain names for the "John Doe" defendants, plaintiff did not move, at that time, to further amend the complaint to add these individuals as parties.  By order

3

dated March 24, 2008, District Judge Kahn granted the motion to dismiss with respect to defendants Kelly and Levine, because there was no indication, in the record at that time, that they were involved in the decision to transfer the plaintiff.  (Dkt. No. 40; Dkt. No. 32 at 9-10).

On the day after the motion to dismiss was decided, Magistrate Judge Di Bianco entered a scheduling order, allowing discovery until September 30, 2008 and setting a January 30, 2009 deadline for the filing of dispositive motions. (Dkt. No. 41). Magistrate Judge DiBianco subsequently extended the discovery deadline until November 30, 2008 and the motion deadline until March 30, 2009.  (Dkt. No. 46).

Defendant Greene filed his first summary judgment motion on March 27, 2009, (Dkt. No. 49), and plaintiff filed responsive papers on June 3, 2009 (Dkt. No. 54), and on October 5, 2009 (Dkt. No. 62).  Although the record strongly indicated that Supt. Greene was not personally involved in the decision to transfer plaintiff, this court recommended that the motion for summary judgment be denied, without prejudice. This court concluded that plaintiff should be provided a brief opportunity to conduct additional discovery so that he could attempt to ascertain the identity of the individual(s) at Great Meadow who were involved in the decision to transfer him, and determine whether the stated reasons for his transfer were pretextual.  (Dkt. No. 64 at 15, citing  *Davis v. Kelly*, 160 F.3d 917, 920-21 (2d Cir. 1998)).

By Decision and Order filed on March 16, 2010, District Judge Suddaby approved my February 3, 2010 Report-Recommendation and denied the first motion for summary judgment without prejudice.  (Dkt. No. 67 at 7-8).  Plaintiff was granted

4

sixty days "to conduct further discovery so that he may attempt to ascertain the identity of the individuals at the Great Meadow C.F. involved in the decision to transfer him, and determine whether the stated reasons for his transfer were genuine." (*Id*. at 8). If warranted, at the end of the sixty days, Plaintiff was granted another thirty days to file a motion to amend his amended complaint. (*Id*.) District Judge Suddaby additionally noted the following:

> First, the Court reads *Davis v. Kelly*, 160 F.3d 917 (2d Cir. 1998), as requiring the denial (without prejudice) of Defendant's motion for summary judgment, under the circumstances, merely out of an abundance of special solicitude to Plaintiff as a *pro se* civil rights litigant. The Court cautions Plaintiff that, once that further special solicitude has been rendered (in the form of an *additional* opportunity to conduct discovery, and an additional opportunity to file a motion for leave to file a Second Amended Complaint), if the same record evidence is presented to the Court (as is now presented to the Court on the current motion for summary judgment), the Court may well rule in favor of Defendant.
>
> Second, during any renewed motion for summary, Defendant is permitted to address the issue of whether sending a letter to the NYSIG [New York State Inspector General] complaining about the use of excessive force against a fellow inmate (with no indication that the letter was sent *on behalf of* that fellow inmate) is activity protected by the First Amendment. The Court notes that it appears far from certain that such activity is in fact protected by the First Amendment. It should be emphasized that the only types of prisoner litigation activity protected by the First Amendment are (1) an attack on the plaintiff's sentence, directly or collaterally, and (2) a challenge to the conditions of the plaintiff's confinement. It should also be emphasized that inmates have only a limited First Amendment right to assist other inmates with their legal claims. Finally, it should be emphasized also that Plaintiff's letter to the NYSIG–as alleged–contains no indication that it was sent on behalf of, and/or even with the knowledge of, Inmate Wright.

(Dkt. No. 67 at 6-7) (footnotes/citations omitted).

This court granted plaintiff additional extensions of time within which to

conduct supplemental discovery and move to file an amended complaint.  Ultimately, he filed a motion to compel discovery on June 2, 2010 (Dkt. No. 72) and a motion to amend his complaint on August 10, 2010 (Dkt. No. 83).  The court reviewed defendant's discovery response (Dkt. No. 75), and concluded that he had substantially complied with plaintiff's requests.[3]  Accordingly, plaintiff's motion to compel was denied and discovery was closed as of August 12, 2010.  (Dkt. No. 84 at 7).

Plaintiff's proposed second amended complaint (Dkt. No. 83) did not address the limited issues for which he was granted permission to amend–namely to identify the party or parties responsible for his alleged retaliatory transfer and the "genuine" reasons for the transfer.  In fact, in a letter to the court filed on the same day that his motion to amend was submitted, plaintiff acknowledged that he "was unable to pin point the actual defendant whom [sic] ordered [his] retaliatory transfer."  (Dkt. No. 80 at 1).  Plaintiff asked to add six new defendants, but the proposed amendments contained no factual allegations with respect to four of those individuals, including Capt. C.F. Kelly.  The other two new proposed defendants appeared to be the "John Doe" defendants at the Auburn facility designated in the original complaint,[4] and plaintiff included allegations only about their conduct **after** plaintiff was transferred from Great Meadow.  Because the plaintiff's proposed amendments far exceeded the

---

[3] Defense counsel represented that he knew of no other documents relevant to the issues for which additional discovery was ordered–the identity of the DOCS employees involved in, and the reasons underlying the decision to transfer the plaintiff in March 2006.  (Seaman Affirm. ¶¶ 12-13, Dkt. No. 75).

[4] Plaintiff attempted to add named individuals in place of the "John Doe" defendants more than two years after Judge Kahn directed him to do so.  (Dkt. No. 12 at 2).

authority granted by District Judge Suddaby in his March 2010 Order, this court denied plaintiff's motion to amend, making his original amended complaint the operative pleading, to which the current summary judgment motion is directed.  (Dkt. No. 84 at 9-12).[5]

## II.   Facts

Plaintiff alleges that on February 27, 2006, he witnessed Correction Officer Molisani beat another Muslim inmate.  (Amended Complaint ("AC") ¶¶ 17, 24). Plaintiff states that as a result of this assault, he filed a "racial assault charge" and sent the written complaint to the New York State Inspector General ("IG").  (AC ¶ 17). Plaintiff states that on March 15, 2006, then-Capt. Kelly told the guards in plaintiff's housing unit to put plaintiff on "72 hour investigation."  (AC ¶ 18).  Plaintiff claims that on March 16, 2006, he was told by an inmate clerk that he was "on the 'DRAFT' PK'D" out of the prison, and that later, several prison guards ordered plaintiff to pack his things immediately.  (AC ¶ 19).

Plaintiff claims that, as he was sitting in the "draft room/basement," he heard Officer Levine on the telephone.  Plaintiff alleges that after defendant Levine hung up

---

[5] In his opposition papers, plaintiff purports to assert a new claim of conspiracy under 42 U.S.C. §§ 1983, 1985, and/or 1986.  (Dkt. No. 98-2 at 2-6; Dkt. No. 103 at 4-7).  For the reasons stated in my prior Decision and Order (Dkt. No. 84), plaintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion.  In any event, as discussed herein, plaintiff has not made a viable substantive retaliation claim that would support the related conspiracy claim he belatedly tries to raise.  Moreover, as defense counsel suggests (Deft.'s Reply Memo. of Law at 6-7; Dkt. No. 99 at 8-9), the conspiracy theory advanced by plaintiff might well be barred by the intra-corporate conspiracy doctrine.  *See, e.g., Cusamano v. Sobek*, 604 F. Supp. 2d 416, 433 n.25, 469-470 (N.D.N.Y. 2009) (granting summary judgment with respect to civil rights conspiracy claims involving DOCS employees based on the intra-corporate or intra-enterprise conspiracy doctrine).

the telephone, he told plaintiff that if the "Boss" wanted plaintiff transferred, he would be transferred. (AC ¶ 20). The amended complaint claims, in conclusory fashion, that defendant/Superintendent Gary Greene ordered plaintiff to be taken out of Great Meadow because several state officials were in the administrative building coming to speak with plaintiff about his complaint to the IG. (AC ¶ 23). Plaintiff states that he was then taken to Auburn Correctional Facility, where he was allegedly told that he was being placed in the Special Housing Unit ("SHU") because the IG was coming to interview him. (AC ¶ 21). The amended complaint claims that plaintiff was transferred in retaliation for his complaints to the IG about the alleged assault of the other inmate. (AC, Count One).

In support of the second summary judgment motion, defense counsel attaches several declarations which finally purport to clarify who was involved in initiating plaintiff's transfer from Great Meadow, and the reasons for the transfer. On or before March 15, 2006, the security staff at Great Meadow reported to Deputy Superintendent (then-Captain) Charles Kelly that plaintiff was attempting to "stir up" other inmates on his block to attack staff at Great Meadow in retaliation for the February 27, 2006 use of force involving Inmate Cleo Wright. (Kelly Decl. ¶ 2, Dkt. No. 89-1; Ex. B, Dkt. No. 89-3). Because of the potential threat that such inmate action could pose to the safety and security of the facility, Dep. Supt. Kelly states that he initiated efforts to separate plaintiff from the other inmates on his block by moving him to a different facility and, in the meantime, into Administrative Segregation ("Ad Seg") at Great Meadow. (Kelly Decl. ¶¶ 4, 5).

In his opposition papers, plaintiff claims it is "a bold face lie" that he was inciting inmates to assault prison staff.  (Pltf.'s Decl. ¶ 3, Dkt. No. 98 at 3).  Dep. Supt. Kelly has no recollection of the sources of the information about plaintiff, and the only direct documentary corroboration is the following reference from the computerized inmate transfer system: "PER SECURITY INVESTIGATION, SMITH HAS BEEN INSTIGATING OTHER INMATES TO PLOT ATTACK ON SECURITY STAFF IN RETALIATION FOR UI  [unusual incident] RESULTING IN USE OF FORCE ON INMATE 00A5789 WRIGHT, CLEO ON 2/27/06.  TRANSFER RECOMMENDED TO ANY FACILITY."  (Kelly Decl. ¶ 3 & Ex. B).  However, among the defense exhibits are three memoranda which plaintiff sent, between March 8th and 15th, 2006, to P. Vanguilder, then the Deputy Superintendent of Security at Great Meadow.  (Dkt. Nos. 89-12, 89-13, & 89-14).  The memoranda make inflammatory references to the "brutal" assault  by the Superintendent's "hitmen" which "almost killed" inmate Cleo Wright.  (Dkt. No. 89-12 at 2; Dkt. No. 89-3 at 1).  In these missives, plaintiff makes several remarks which clearly suggest that he was discussing the alleged assault with other inmates in very charged terms.  (Dkt. No. 89-12 at 2 ("**as to the information I was given** regarding the bruital (sic) assault on Mr. Cleo Wright . . . **Its (sic) been brought to my attention** that it was Prison Guard Molisani . . . who broke the mans (sic) rib cage . . ."); Dkt. No. 89-13 at 2 ("**I heard that** one of the guards who punched Mr. Wright in the face . . . admitted on paper that he punched Mr. Wright in his face "JUST ONCE!") (emphasis added)).

Dep. Supt. Kelly states that he was aware that plaintiff was a "writer," meaning

he frequently wrote grievances and complaints.  However, he claims that this perception did not play any role in his decision to separate plaintiff from the inmates on his block by moving him to Ad Seg and seeking his transfer to another facility. (Kelly Decl. ¶¶ 12, 13).  The defense papers document that plaintiff had pursued at least 16 grievances at Great Meadow between 2003 and 2005, during which time there were no apparent efforts to transfer him.  (Dkt. No. 89-17).

A clerk named Scott Iannone began preparing the forms needed for the required Ad Seg hearing.  (Kelly Decl. ¶¶ 4, 9).  The person at Great Meadow who prepared the transfer request, at the direction of a superior and with information provided by others, was Senior Counselor Norman Vadnais.  (Vadnais Decl. ¶ 3, 5-6, 10-11, Dkt. No. 89-5; Ex. A, Dkt. No. 89-6).  Sr. Counselor Vadnais states that he was not aware of any complaints by Inmate Smith.  (Vadnais Decl. ¶ 2).

Once a facility makes an inmate transfer request, the DOCS Classification and Movement office in Albany makes the ultimate decision as to whether to transfer an inmate out of the facility; and it would determine the new facility to which the inmate would be sent.  (Kelly Decl. ¶¶ 5, 6; Carvill Decl. ¶ 2, Dkt. No. 89-7; Vadnais Decl. ¶ 4).  The transfer request was received at DOCS Classification and Movement on March 15, 2006.  (Carvill Decl. ¶ 3).  The classification analyst at Classification and Movement assigned to this request was John Carvill, who did not know Inmate Smith. (Carvill Decl. ¶¶ 4, 8).  He approved plaintiff's transfer, sending him to Auburn Correctional Facility ("Auburn") on March 16, 2006.  (Carvill Decl. ¶ 5; Ex. A, Dkt. No. 89-8).  When Dep. Supt. Kelly learned that plaintiff's transfer was scheduled for

March 16, 2006, he determined there was no need to pursue the Ad Seg hearing, so he cancelled it.  (Kelly Decl. ¶¶ 6-9; Ex. A; Dkt. No. 89-2).  Supt. Greene, in connection with the first summary judgment motion, claimed that he played no role in plaintiff's transfer.  (Green Decl., Dkt. No. 49-3).

When plaintiff arrived at Auburn on March 16, 2006, he was housed overnight in a cell in the special housing unit ("SHU").  (Smith Decl., Dkt. No. 89-9; Ex. A, Dkt. No. 89-10).  According to Anthony Smith, a Correction Officer at Auburn, it is not uncommon to place an incoming inmate in an SHU cell overnight when general population cells are not available.  (Smith Decl. ¶ 5).  Just after 10:00 a.m. the following morning, March 7, 2006, plaintiff was moved to a general population cell at Auburn.  (Smith Decl. ¶ 4, Ex. A).

As noted above, plaintiff alleges that he was abruptly transferred from Great Meadow because DOCS staff knew he was about to be visited by someone involved with the IG's investigation of the Cleo Wright incident.  Plaintiff also claims that, he was told by correction officers at Auburn that he was initially moved to the SHU there "because the Inspector General is coming to talk to you."  (AC ¶ 21).

Mark Miller, now an Assistant Deputy IG, was assigned to conduct the IG's investigation of the Cleo Wright incident in March 2006.  (Miller Decl. ¶¶ 1, 2, Dkt. No. 89-11).  Ass't Dep. IG Miller never had any plans to interview plaintiff at Great Meadow, or anywhere, on March 16, 2006.  (Miller Decl. ¶ 4).  On March 16, 2006, he went to Greene Correctional Facility in the morning until about 1:00 p.m. and then went to his Albany office before leaving for home early that day at about 3:00 p.m.

(Miller Decl. ¶¶ 7-8; Ex. D, Dkt. No. 89-15).  Ass't Dep. IG Miller states that he has never notified facility personnel of his plans to come to their facility to interview an inmate; he has access to the DOCS computer database which provides up-to-date data on where a particular inmate is being housed.  (Miller Decl. ¶ 5).  In any event, according to Dep. Ass't IG Miller, DOCS staff could not prevent an IG investigator from interviewing an inmate by moving that inmate to another facility, because the investigator can simply go to the new location to conduct his or her interview.  (Miller Decl. ¶ 6).  Miller did ultimately interview plaintiff about the Cleo Wright incident–on June 2, 2006–but did not attempt to interview plaintiff before then.  (Miller Decl. ¶ 4).

Plaintiff characterizes Ass't Dep. IG Miller's declaration as "false testimonial as well as documentary evidence."  (Dkt. No. 103 at 5).  In support of this claim, plaintiff relies on a letter to him from Cleo Wright's attorney, which he claims documents that he had an appointment with the IG scheduled for March 16, 2006.  (Dkt. No. 98-3 at 3).  However, the letter, dated October 30, 2009, merely refers to a report of an interview that plaintiff supposedly had with the DOCS Inspector General's Office in March 2006.  (Dkt. No. 98-2 at 12).  Plaintiff himself acknowledges that he was not actually interviewed by the IG until June 2006, well after his transfer from Great Meadow.  (AC ¶ 30).  In all likelihood, the attorney is referring to the three memoranda plaintiff sent to Dep. Sup. Vanguilder at Great Meadow in March 2006, which discussed the Cleo Wright "assault," and which were part of the IG's investigative file.  (Miller Decl. ¶¶ 3, 4; Exs. A-C, Dkt. Nos. 89-12, 89-13, & 89-14).

The records of the Central Office Review Committee, which is the final

administrative appellate body for resolving inmate grievances, has no record of a grievance from plaintiff complaining about his transfer out of Great Meadow in March, 2006.  (Hale Decl. ¶9, Dkt. No. 89-16; Ex. A, Dkt. No. 89-17).  Plaintiff concedes that he did not file a grievance with respect to his transfer.  He claims that he was deterred from pursuing a grievance because he was moved into the SHU upon his arrival at Auburn and threatened by a Capt. Rourke to "mind my business."  (Dkt. No. 98-1 at 4; Dkt. No. 98-2 at 10; Dkt. No. 103 at 8-9).  Plaintiff also claims that "the IGRC's Supervisor [at] Auburn told us new prisoners do not file any grievances here if it pertains to our previous facility."  (Dkt. No. 98-2 at 10).[6]

## III.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56[7]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). Ambiguities or inferences to be drawn from the facts must be viewed in the light most

---

[6] Defendant's second summary judgment motion raises, for the first time, the argument that plaintiff's amended complaint should be dismissed for failure to exhaust administrative remedies.  Plaintiff's allegations of threats and misinformation from DOCS employees could conceivably create a material issue of fact as to whether there were special circumstances that would excuse his failure to exhaust.  *See, e.g., Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" that justified plaintiff's failure to exhaust).  This court will not address the exhaustion issue given its recommendation that defendant's summary judgment motion should be dismissed on other grounds, including qualified immunity.

[7] Rule 56 was extensively amended, effective December 1, 2010.  As the Advisory Committee Notes indicate, "the standard for granting summary judgment remains unchanged." The revised rule explicitly adopts procedures relating to summary judgment motions "consistent with those already used in many courts."

favorable to the party opposing the summary judgment motion.  *Id*.  However, when

the moving party has met its burden, the nonmoving party must do more than "simply

show that there is some metaphysical doubt as to the material facts."  *Matsushita*

*Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see*

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

    In meeting its burden, the party moving for summary judgment bears the initial

responsibility of informing the court of the basis for the motion and identifying the

portions of "'the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any,' which it believes demonstrate the absence of

a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

FED. R. CIV. P. 56 (c)(1)(A).  Where the nonmovant bears the burden of proof at trial,

the moving party may show that he is entitled to summary judgment by either (1)

pointing to evidence that negates the nonmovant's claims or (2) identifying those

portions of the nonmovant's evidence that demonstrate the absence of a genuine issue

of material fact.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing

*Celotex Corp.*, 477 U.S. at 323);  FED. R. CIV. P. 56 (c)(1).  The second method

requires the movant to identify evidentiary insufficiency, not merely to deny the

opponent's pleadings.  *Id*.

    If the moving party satisfies its burden, the nonmoving party must move

forward with specific facts showing that there is a genuine issue for trial.  *Id*.  "Only

disputes over facts that might affect the outcome of the suit under governing law will

properly preclude summary judgment."  *Salahuddin v. Coughlin*, 674 F. Supp. 1048,

14

1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material

fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict

for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether there

is a genuine issue of material fact, a court must resolve all ambiguities, and draw all

inferences, against the movant.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655

(1962).

## IV.   **Personal Involvement**

Personal involvement is a prerequisite to the assessment of damages in a section

1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v.*

*Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347

F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir.

1986), the Second Circuit detailed the various ways in which a defendant can be

personally involved in a constitutional deprivation, and thus be subject to individual

liability.

A supervisory official is personally involved if that official directly participated

in the infraction.  *Id.*  The defendant may have been personally involved if, after

learning of a violation through a report or appeal, he or she failed to remedy the

wrong.  *Id.*  Personal involvement may also exist if the official created a policy or

custom under which unconstitutional practices occurred or allowed such a policy or

custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if

he or she were grossly negligent in managing subordinates who caused the unlawful

condition or event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007)

15

(citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In support of both of his motions for summary judgment, Superintendent Greene has argued he had no personal involvement in the decision to transfer the plaintiff out of Great Meadow.  In his original Declaration, defendant Greene directly denied the allegation in the amended complaint that he "ordered his prison guards to get rid of plaintiff before plaintiff had the opportunity to give a statement to . . . the Office of the Inspector General." (Greene Decl. ¶ 4, Dkt. No. 49-3).  Defendant Greene stated that he delegated, to subordinates in his facility matters involving the transfer of inmates to other facilities.  (Greene Decl. ¶¶ 5, 6).  He further averred that, in the more than three years that he was Superintendent at Great Meadow, he "never 'ordered,' 'directed,' or otherwise effectuated an inmate's transfer out of the facility for any reason."  (Greene Decl. ¶ 9).  Defendant Greene also noted that, pursuant to DOCS Directive No. 4017, entitled "Inmate Transfer Procedure," the DOCS Office of Classification and Movement ("OCM") in Albany had the sole authority to, and did issue transfer orders for inmates in maximum security facilities.  (Greene Decl. ¶¶ 5, 6; Ex. B, Dkt. No. 49-4).

In support of his first summary judgment motion, defendant Greene stated that, although he had no specific recollection of the plaintiff, or any of the alleged incidents giving rise to the instant lawsuit, his review of the documents confirmed that he did not make the decision to transfer plaintiff on March 16, 2006.  (Greene Decl. ¶ 7).  In defendant's Reply Memorandum of Law in support of the pending motion (at p. 2), defense counsel states:  "As a result of the post-motion discovery directed by the

16

court, this office was able to reconstruct pretty well who was involved in the transfer, what they did and why they did it." (Dkt. No. 99 at 4).  As discussed above, the declarations and exhibits submitted to the court in support of the second summary judgment motion document that then-Captain Kelly requested the transfer based on information from the Great Meadow security staff that plaintiff was attempting to incite other prisoners in the aftermath of the alleged beating of inmate Cleo Wright. Great Meadow Sr. Counselor Norm Vadnais submitted the transfer request to the DOCS Classification and Movement office in Albany, where it was processed by John Carvill, who granted the request and approved plaintiff for transfer to Auburn.

Despite repeated opportunities to present evidence of Supt. Green's personal involvement in his transfer, plaintiff has never presented more than conclusory accusations and unsupported conspiracy theories.  The only remotely factual support that plaintiff has offered is the alleged comment of Correctional Officer Levine at Great Meadow that "the boss" wanted plaintiff transferred.[8]  Particularly because then-Capt. Kelly has now acknowledged that he did, indeed want the plaintiff moved out of Great Meadow, plaintiff's purported inference that Supt. Greene (as opposed to Capt. Kelly or some other ranking officer)  was the "boss" mentioned by Correction Officer Levine is too speculative to create a material issue of fact.  *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 432-33, 469 (N.D.N.Y. 2009) (plaintiff's contention that

---

[8] Plaintiff now also claims that he encountered Supt. Greene on the day of his transfer, and "the defendant walked past me and gave me a look that needed no words." (Dkt. No. 98-1 at 5).  Even if true, this provides absolutely no support for plaintiff's claims regarding defendant Greene's involvement in his transfer.

defendant Sobek was on the other end of a telephone conversation was a mere "guess" insufficient to defeat a grant of summary judgment with respect to a claim that defendants conspired to violate plaintiff's civil rights).

Based on the information submitted by defendant in connection with both motions for summary judgment, this court concludes that no rational fact finder could conclude that Great Meadow Supt. Greene was personally involved in plaintiff's transfer.  Accordingly, the motion for summary judgment should be granted and plaintiff's amended complaint against defendant Greene dismissed.

## V.   Retaliation

Supt. Greene is the only defendant remaining in this action and defendant's various efforts to include other DOCS employees as defendants have, as outlined above, been properly denied.  However, in light of the belated confirmation that identified DOCS employees, primarily then-Capt. Charles Kelly, were personally involved in initiating the request to transfer plaintiff, this court will briefly address the merits of plaintiff's retaliation claim.

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action.  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). "A prisoner has no liberty interest in remaining at a particular correctional facility, . . .

18

but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights . . . ." *Davis v. Kelly*, 160 F.3d at 920.

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)).

With respect to Sr. Counselor Vadnais at Great Meadow and John Carvill of the DOCS Classification and Movement office in Albany, they were clearly involved in processing plaintiff's transfer. However, Sr. Counselor Vadnais stated that he was not aware of any complaints made by plaintiff, and Mr. Carvill did not even know plaintiff. The plaintiff has not offered any contrary evidence in his opposition papers. There is absolutely nothing in the record to indicate that either man harbored any retaliatory motive towards plaintiff, or that their actions were in any way caused by plaintiff's complaints about the alleged assault of Cleo Wright.

19

With respect to then-Capt. Kelly, no rational fact finder would be persuaded that his stated, security-related, reasons for requesting plaintiff's transfer were pretextual.  If Dep. Supt. Kelly was motivated only by a desire to retaliate against plaintiff by transferring him–as opposed to genuine concerns that plaintiff would incite other inmates–Dep. Supt. Kelly would not have immediately initiated proceedings to place plaintiff in Administrative Segregation pending the processing of the transfer request.  Notwithstanding plaintiff's claims that he was not attempting to incite his fellow inmates to violence, his written statements to then-Dep. Supt. Vanguilder strongly corroborate that he was using charged rhetoric in discussing the Wright incident with fellow inmates.  If Capt. Kelly or others at Great Meadow were inclined to transfer plaintiff in retaliation for his complaints and grievances to the authorities, they would presumably have done so previously in response to the steady stream of grievances he filed in the prior three years at that facility.  Plaintiff's claims about the connection between his sudden transfer and the purportedly scheduled visit of the IG on March 16, 2006, are completely contradicted by the documentary and other evidence submitted by defense counsel.[9]  Because it was clear that plaintiff would have been transferred in March 2006 whether or not he had complained to

---

[9] *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' . . .  and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted).  *See also Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

20

DOCS or the IG about the alleged assault on another inmate, his retaliation claim would fail on a motion for summary judgment, even against Dep. Supt. Kelly.

In any event, as District Judge Suddaby noted in his opinion on defendant's first summary judgment motion, it is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *Smith v. Greene*, 9:06-CV-0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (citing *Nevares v. Morrisey*, 95-CV-1135, 1999 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis*, 533 F. Supp. 2d 337, 339 (W.D.N.Y. 2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips*, 66 F.3d 470, 478-79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate).  Because the controlling law on this issue was unclear as of 2006, the time of the conduct in this case, any DOCS employee personally involved in the decision to transfer plaintiff would be protected by qualified immunity, even if they were influenced by the fact that plaintiff complained about the alleged assault of another inmate.

## VI.   **Qualified Immunity**

Qualified immunity generally protects governmental officials from civil liability

"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).  In determining whether qualified immunity applies, the court may, but is not required to, first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases").

It is well-established that an official may not transfer an inmate in retaliation for the exercise of a constitutional right.  *Davis v. Kelly*, 160 F.3d at 920.  However, as noted above, the law was not clear, at least as of 2006, that an official who transferred

22

an inmate based on his complaints regarding the treatment of another inmate, committed a constitutional violation.  Accordingly, any DOCS employee who was involved in plaintiff's transfer is entitled to qualified immunity, even if they were motivated by his complaints about the alleged assault on another inmate.  *See, e.g., Lewis v. Johnson*, 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *15, 22 (N.D.N.Y. Aug. 5, 2010) (Report-Recommendation) (even if a defendant who took adverse action against plaintiff was substantially motivated by plaintiff's letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim because the law is not clear whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment), adopted, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010); *Pettus v. McGinnis*, 533 F. Supp. 2d at 340-41 (dismissing a retaliation claim based on qualified immunity because it is not clearly established in this circuit that a prisoner has a constitutional right to testify in a disciplinary hearing of another inmate ).

## VII.  Dismissal with Prejudice

Plaintiff has argued that he needs an additional opportunity for discovery to support his claims and to oppose the pending motion for summary judgement.  He has also attempted to add new claims to this case through his motion papers.  As discussed above, the plaintiff has been given more opportunities than perhaps even a *pro se* litigant deserves to gather discovery, to articulate and support his claims, and to prepare his opposition to the pending motion.  In any event, it is clear, based on the analysis above, in particular with respect to qualified immunity, that further discovery

or opportunities to replead will not help plaintiff establish a triable issue of material fact or remedy the substantive defects in his claims. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (where a defect in a claim is substantive, a futile request to replead should be denied; and, where there is no reason to expect that additional discovery will reveal a material issue of fact, a remand for discovery is inappropriate, particularly when a claim has been dismissed based on immunity grounds). Accordingly, this court recommends that plaintiff's amended complaint be dismissed with prejudice.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 89) be **GRANTED** and plaintiff's amended complaint be dismissed, in its entirety, with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated:  February 1, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge